RICOH v. AEROFLEX, LTD, 2012-15-22 Mr. Brothers, I guess you're going to give us a synopsis of your argument. I believe I will, Your Honor. Thank you. And may it please the Court, 18 months ago, when I stood before you, when the Court was sitting in Portland, this Court criticized the synopsis evidence with regard to the copy costs, vacated the judgment with respect to the copy costs, and remanded it to the District Court. On remand, the district synopsis utterly abandoned its evidence that it previously had provided. It provided no new documentary evidence for any of its copy costs. And the district judge essentially agreed with you, right? Then said that RICOH failed the bill. Well, the district judge found that synopsis had failed to meet its burden of proof with regard to the volume of documents that were produced. And we had produced evidence pointing out the errors in the synopsis declarations. What the district court failed to appreciate was that virtually all of those documents had been produced electronically. And what synopsis, in abandoning its prior approach, and with its new approach, Wait a second. What's the basis for the notion that the documents were produced electronically? You have two invoices in here. Is there anything else? I mean, there's no question. Nobody's disagreeing that a lot of documents were produced electronically. The question is whether the documents that are the subject of the dispute here were produced electronically or were produced to Merrill and Hardtop. And the issue, the Merrill agreement, were related to the electronic production of documents. Wait, wait, wait. My understanding is that what happened was a large number of documents that were in hard copy in the files, that they were copied and then given to Merrill so that Merrill could scan them in for the electronic database. Is that correct? Well, there were, from the documentation, Is it correct or not? 138,000 Is it correct? Am I correct? You are correct for 138,000 pages of 5.5 million documents. Well, what's the basis for that? The synopsis documentation that they produced in the first production identified by Bates number hard copies for 138,000 documents. Those were collected, they were part of the record in the first appeal and they were compiled again as Exhibit B to the McCandless Declaration. What's your evidence that the Bates numbers here include electronically produced documents? Because Wait a second. As I look at your invoices, the two invoices that you rely on, there isn't but a minor overlap between the Bates numbers in those two invoices and the Bates numbers that were said to be produced in hard copy. On page 9 of our reply brief, we cite to evidence that reflects from the invoices Those are the two invoices. I believe there were more invoices than that. They were identified as having the materials produced to Merrill were native production. Yes, but those Bates numbers, with minor exceptions, don't overlap the Bates numbers for which they're claiming hard copies were made. Oh, I understand, Your Honor, and you're correct. That there is a dissonance between the prior identification of Bates numbers that were in hard copy as reflected in the Exhibit B to the McCandless Declaration and then the new documents that were produced pursuant to the Merrill Agreement. See, all of the documents that were produced after August 30, 2005, pursuant to the Merrill Agreement, were produced electronically. And there's no dispute to that. And we cite the stipulation, we cite the contemporaneous email to that, and we cite dozens of Merrill invoices reflecting that. So everything produced after that date was produced electronically because that was the terms of the Merrill Agreement. And those costs were shared between the parties. And again, there's no dispute as to that. That is shown in all of the Merrill invoices, that the costs were equally divided. So the issue here is what the district court did was to take 5.5 million Bates numbers, of which, under the evidences we have seen, we can identify... I don't understand how this dispute could possibly exist. I mean, either 5 million copies of documents were made or they weren't. You might argue, well, it should be 4.5 million or 5 million, but, I mean, it's a vast quantity of documents. Why is there a dispute about that? The issue is with regard to form of production. The synopsis is seeking costs. Look, if the documents were produced in hard copy and were Xeroxed, and there were 5 million of them, somebody knows about that, right? That's correct, but that did not happen in this case. There were 5.5... Synopsis identified 5.5 million pages of which virtually all were produced electronically. And synopsis will not stand here after I sit down and tell you that 5.5 million hard copy documents were produced to RICO because they were not. They were produced in Merrill. Well, the documentation... First of all, there's no evidence to support that. The documentation that we do have from the invoices reflects native documents. They reflect both electronic documents and they reflect photocopies being collected. The case law, however, says, as this panel ruled in the first appeal, that what is only taxable is the cost as produced to the other party. And the cost as produced to RICO were pursued to the Merrill Agreement, which were shared 50-50. If synopsis chose to make interim photocopies... Were 5 million hard copy documents produced to Merrill? I don't know that. There's no evidence to support it. I was not involved in that production, and there's been no evidence to my knowledge in the record to reflect that. But even if they were, as the Kmart says, those interim copies, because synopsis could have taken the originals and had those... Whether you copy or whether you image, it is the same process. It's putting it on a machine, glass, and it's either an image or a hard copy. For its convenience, apparently, to the extent there were hard copy originals, synopsis chose to make another copy of them instead of electronically imaging. But whatever it chose to do in those interim steps is not taxable. Because what is taxable is only the cost of the documents as produced to RICO. And here they were produced electronically under the Merrill Agreement. And what the district court did is, as far as we can tell, unprecedented. By taking electronic production, 5.5 million electronic pages, and applying a hard photocopy cost to that. This court has never countenanced that, and no appellate court that I am aware of has ever countenanced that. Synopsis cites no such cases in the brief. That is what the district court did here, and that is what synopsis is asking you to affirm. Electronic production is the way documents are produced today. Under 19-20, and the guidelines under 19-20, in fact, as the Supreme Court indicated in the Takaguchi decision, which I know relates to interpreter costs, but it has a paragraph on pages 12 and 13 of the opinion, in which it says that all costs under 19-20, they are relatively minor, they are limited by statute, they are modest in scope, and it advised against trying to stretch the scope of 19-20. Which is consistent with the Crawford Fittings decision of the Supreme Court in 1987. So here what we have to do is look at what is within the scope of 19-20. And as this panel ruled, after the first appeal, there needs to be the requirements that I have outlined. Let me just reference it. Because what synopsis did in its response, this panel said when the prevailing party seeks to recover copying costs related to its own document productions, to meet the documentation requirements, the prevailing party must establish in connection with the proposed bill of costs, one, that the reproduced documents were produced pursuant to Rule 26 or other discovery rules, two, that they were copied at the prevailing party's expense, and at the request of the opposing party, which goes to your question, and also, most importantly under the Merrill Agreement, three, that the copies were tendered to the opposing party. Synopsis knew it couldn't meet that standard. Instead, it seized on the court's language with regard to estimates, which this court, in fact, Judge Bryson, in your opinion, had identified giving district courts some latitude of making discretions, but it said, we're just going to total the number of base numbers, apply a photocopy charge, and call it a day. No new evidence. And the way that synopsis presented that to the district court was that this is a wholly alternative way of doing it, separate and apart from providing any documentary evidence. That, we submit, is outside the scope of 1920, and is why that should be reversed. Let me see if I understand your legal position in one regard. Suppose that you have documents which are very old documents in paper form, and the only way to convert and ultimately produce those documents in a more convenient electronic form is to make copies of them in the first instance, and then that copying process will allow you to make electronic copies of them. You're not contesting, are you, that the cost of producing those documents may not include the initial step of copying the documents? Under the law, they cannot. You're saying you cannot include that cost? No, those cannot be taxed. You cannot tax that as part of the cost of producing the electronic copies? That's right, for two reasons. First, Ninth Circuit Kmart case said that interim step is a convenience for counsel. But wait. You're saying, then, that you want the documents in electronic form, because it's much more convenient for you. You don't end up with truckloads of paper documents. Okay. The only way they can do that to satisfy your request for electronic copies, by my hypothesis, is to initially make, not for their own convenience, but for the convenience of the vendor that is making electronic copies. The only way to do it is to physically copy each document first. You say that none of those costs can be assessed? Well, unless there's an agreement to the contrary. Your argument is that they could have scanned the original documents. They didn't have to make copies, right? Well, my argument is twofold. One, they could have scanned those original documents. Second, the agreement, the Merrill Agreement, where their cost is splitting for the cost of production, precludes the taxation of costs. In your example, under the rules, and in the old days when I grew up, originals could be offered for production. And then the receiving party could elect what to do with it at its own expense or make an agreement otherwise. So those originals, in your hypothetical, no copies need to be made unless the receiving party chooses to request those copies. Now, under your hypothetical, if the producing party elects to not make the originals available for production, that is its choice. And it can make those photocopies. Now, I think the smart thing to do is to scan it, because whether you scan it or copy it, it is the same. It's the exact same process. But the Ninth Circuit and a number of district court decisions consistently held that that interim step of making that copy, which was not produced, but something else was produced to the other side, is not taxable. But that's not the case that we have here in any event. Mr. Brevis, you're well into your rebuttal time. Do you wish to save it? I will save it. Thank you, Your Honor. Mr. Frankel, we appreciate your willingness to stand in for your colleague who was delayed by weather. We'd much prefer hearing the case that we prepared for than postponing it. Thank you, Your Honor, for your indulgence. And in case I do need the record, we're not able to get the documents here either, so I have it on the computer in case I need it. May it please the Court, I just want to open by responding throughout RICO's briefs and the argument today, RICO is implying that in order to recover costs under 1924, that copies, physical copies that are made, have to be tendered to RICO. There's no dispute here that RICO was tendered over 5.5 million pages of documents. Yes, there is, because the documents were tendered to Merrill. Right. I do think it's important to be clear about what happened. I found both sides' briefs to be frustrating in the inability to be clear about what happened, as to which I think there's little dispute. 5 million copies, not tendered to RICO, but tendered to Merrill. That's correct, Your Honor. I think that the copies were tendered to Merrill because as part of the process, the parties did agree to OCR the documents. And that was, as Judge Bryson pointed out, an extreme convenience for RICO, because they were able to then do searches and find documents a lot quicker. We could have produced truckloads of documents. If you recall, the Stratify Agreement, which this court did not allow due to an actual agreement, was used as a repository for email and source code. That was where a lot of documents were directly uploaded, if you will. Here, a lot of these documents, and there was evidence in the record, contrary to what counsel said, the declaration of Denise DeMori at A3637 establishes that Synopsys had to go to, again, there are eight customers, hundreds of accused products, and they had to go make copies, provide them to Merrill, so Merrill could scan them in, OCR them. Who hired Merrill? Who proposed Merrill? Your Honor, I do not know the answer to who originally proposed Merrill. It was employed jointly? Yeah, there was a Merrill agreement in terms of sharing the costs of OCR and imaging. I do want to make a couple points about that agreement. RICO could have raised that agreement, the first appeal or below, and the first appeal did not. We believe that RICO did not contest the entitlement of Synopsys to recover for copying costs. In fact, RICO told the court that Synopsys was entitled to $146,000 worth of copying costs in the first appeal. It's only on the second appeal they claim that all of these documents were covered by this Merrill agreement, and that the copying, therefore, couldn't be recovered at all, so Synopsys is not entitled to copying at all. Well, RICO waived that argument by not raising it the first time. And then, you know, we aren't seeking to recover for the OCR and costs. We are seeking to recover for the costs that were necessary to tender the documents to RICO. And yes, Your Honor, we did tender the documents electronically. There were some documents that were tendered physically because those were documents by their nature that could not have been scanned in. For example, if you have an oversight... Well, your contention is that a tender to Merrill is the equivalent of a tender to RICO, right? Well, the documents themselves... No, answer. The answer to your question is yes. That is my contention. And the reason... That's the real issue here. I mean, obfuscated considerably, but that's the real issue, is whether the tender to Merrill allowed the recovery of costs as opposed to the tender to RICO. And again, this Court said, and this is 661 F. 30, 1369, the District Court may choose to make a reasonable estimate of recoverable copying costs based on an estimate of the total number of pages of discovery that RICO requested be copied, it doesn't say by whom, multiplied by a reasonable price per page. Those documents that RICO requested, and we put in a lot of evidence about their very broad document requests, they were very aggressive, filed many motions to compel. Those documents were copies, and they were eventually tendered to RICO. We think that we met the standards... They were tendered to RICO. They were tendered to Merrill. And the question is whether that's the same as tendering them to RICO. Your Honor, when I say that... It's important not to misdescribe what happened. I understand what you're saying. I'm not trying to misdescribe it. What I'm saying is when a page of a document is copied and then scanned in and then provided to RICO, to me at least, that is a tendering of that document to RICO. It's tendering in a different form, but the law cannot be that one can only recover for copy costs if you send the physical paper to the other side. That would be just a wrong result. Now this case might be somewhat of an anachronism because it did start in 2003 and requested documents going back into the late 1990s. Today, many companies have all their documents electronically. We may not see many cases... Suppose that all the copies... Suppose you have a request for 100,000 documents and they all happen to be, fortunately, on an electronic form or have been preserved already in electronic form. And so what you do is you produce a CD. You can't charge 8 cents a page for that, can you? I would agree with that, Your Honor, and that's not what the evidence shows here in this case. Why is 8 cents a page? What is it that makes 8 cents a page reasonable in this case for the 5 million documents that you're being... Well, Your Honor, when we put evidence in there below that the range of copying... the amount that was charged for copying ranged from 8 cents up to as much as 20 cents for the actual physical copying. And that is because you say you actually had to, or Merrill, you and Merrill together, somebody in the chain of possession here, chain of custody, had to make a physical copy as part of the production process. That's your claim? Yes, Your Honor. And you have evidence that that was required with respect to either all or virtually all of the documents? So we have the declaration of Mr. Morey at A3637. I don't know how we could have provided evidence for every single page of the 5.5 million... No, no, I mean, you would have to say, well, with respect to page 1,576, I saw that that was copied. But what you're saying is that was your modus operandi and it was required as a matter of effective physical compulsion. That's the only way you could get it into the form in which it was ultimately produced. That's your conviction, right? Yes, Your Honor. And, in fact, there were many more pages... Why couldn't the original copies have been produced and scanned in electronically so there was no interim hard copy? So that would have required each of these eight defendants to take their originals, ship them somewhere, so that then Merrill could have taken them one page at a time and scanned them in. And that would have been an extremely inefficient process, Your Honor. Wait a minute. I don't understand the one page at a time. They're doing it one page at a time, whether they're doing it from a copy or from the original, right? That's true, Your Honor. But the... So your question is, why can't the originals just be scanned in directly and then OCR them from there? Because they also had to be reviewed. Synopsys, in order to produce the documents, Synopsys had an obligation to review them to make sure they were relevant and responsive to RICO's request. There was evidence in Mr. Mori's declaration on the same page that there are actually many more documents that were copied that Synopsys reviewed and did not produce, and those are not included in the $5.5 million. Those documents, Synopsys paid for, and it's not part of what was tendered to RICO, when I say RICO did not receive them in request for his document, pages of discovery that RICO requested be copied. So what you're saying is that the original files were all copied and then you decided which of those copies would be actually produced. That's what was in Mr. Mori's declaration, Your Honor, and that's what happened. I'm no expert on modern technology of scanning and so forth. I do understand photocopying, I think, at least at a primitive level. But when you go from, let's say, a file drawer full of hard copy documents to scanning, I take it that that still has to be done on a one-off basis, that somebody has to stand there and scan in the document, correct? There's no machine that scans an entire file drawer of documents. I think it depends on the type of document today. Let's assume the file drawer, then, for starters. Maybe no one has file drawers anymore. They do. I think you can feed in these documents into some kind of feeder that would automatically... But you can do that with photocopiers, too. Sure, but I don't actually know what kind of technology existed when this scanning was done back in 2005, and that's a little bit of a disappointment. I guess for me, scanning and photocopying is the same operation, but maybe I'm being unsophisticated about this. So, I don't think so at the time. Photocopying produces a piece of paper coming out the other end of the machine, and scanning doesn't. But other than that, is there really a difference? I mean, on a philosophical basis, I think they both create images. There's a machine, yeah. And if they all start with a collection of pieces of paper pulled from a number of different files, someone has to feed it in, presumably on a one-by-one basis, right, into the machine. Yes, I would think so, yes. All right. So, basically, what happened here is you got these original files. You didn't want to pull out the stuff that was going to be produced from those files, give it to Merrill, and allow them to scan it in, because that would destroy the integrity of the original files, or it would be a pain in the neck to take those documents back once Merrill had scanned them and reintegrate them into the original files. I think you're right on integrating both aspects. It would have been impractical, and they did need to be reviewed, yes. Could I turn you to the Tamaguchi question? Sure, Your Honor. If I understand correctly, you don't dispute that under Tamaguchi these document translation costs are not recoverable, right? That's correct, Your Honor. We do not dispute that under the Supreme Court decision in Tamaguchi that the costs are not recoverable. What we're disputing is that RICO had the right to raise it upon remand from this court, which was remand was limited to the copy cost issue. They had not appealed the district court's written translation costs in the first appeal, and that is the same kind of waiver that was in the Tronso case from this court. Well, I guess the problem that I see is if they were raising an issue that required further litigation, then the waiver would have a lot of force, but that's not the situation here. We would be, if we adopted your position, we would be approving the entry of a judgment which is spatially incorrect, awarding document translation costs that are not recoverable. That's what bothers me. It's not as though they waived an issue which required further litigation. It's that they waived an issue that on its face would require that the judgment be reduced. So this court already affirmed the district court's original ruling, and so RICO did not even appeal the written translation costs. But you understand what I'm saying. It's just uncomfortable to say, well, the district court should enter a judgment which we know is in part wrong. Is it your view that petitions for cert had already been filed and that the issue was sort of mixed around the country? They were sort of on notice. They could have raised it. That's right, Your Honor. There was definitely a circuit split as to whether written translation costs were allowable. The Ninth Circuit often gets reversed by the Supreme Court, and RICO could have appealed that issue. They appealed about every other issue. You could assume that the Ninth Circuit was going to be reversed. Right. Some people might assume the Federal Circuit might be. The Federal Circuit has a little better record, I think. But the written translation cost issue, I understand where Your Honor is coming from, but the only reason why it's in the judgment upon remand is because RICO raised it where the district court said was, no, that's not within the scope of the mandate. You can't raise it. And so in essence, it's not part of the judgment. It's part of the new judgment. It's part of the original judgment that hasn't been affected yet because the district court stayed it pending full resolution of all issues by this court. And so I would suggest, Your Honor, that it's the copy cost issue and the copy cost issue alone that's at issue in this appeal and that Taniguchi should not be at issue because it was waived. Thank you, Your Honor. Thank you, Mr. Frankel. Mr. Brogues, your minute and 40 seconds of rebuttal time. Thank you. With regard to Taniguchi, that issue was raised on remand. Judge Dyke, in your opinion, you cited Taniguchi because this court follows the regional law and Taniguchi was controlling law. Yeah, but you hadn't raised it. I mean, it's true that our opinion cited Taniguchi, but if it had left out any reference to Taniguchi, the opinion would have still dealt fully with all of your issues. It just happened to have mentioned that this issue, which you didn't raise, was part of the original judgment. I don't see how that reference to Taniguchi helps you at all. Well, no. The point was that a question was asked was whether cert pending when this case was argued. Cert hadn't been granted when it was briefed. Cert was pending when it was argued and when the case was decided. But we have cited, for example, in the Morris case in our briefs, which is very close to what we have, where the court, the Eighth Circuit, held that an intervening change of law that fundamentally changes the basis of the judgment, even though the Supreme Court decided that there was 19 days after judgment was entered, here Taniguchi was 21 days after judgment was entered. And the Eighth Circuit said, we must apply that new change in intervening law. And that is the case that we have here. Normally, in situations in which there is some reason to think that the law may change, a party who does not preserve an issue is regarded as having waived it. That is not a correct statement of the law under Morris. Well, how about Engel against Isaacs, in which that's exactly what the Supreme Court said, and Reed against Ross, which is exactly what the Supreme Court said. So if you've read those cases and you think you can distinguish them, then tell me. But otherwise, that, I think, is a fair statement of what the principle of law that applies. Well, I think the point here is, first of all, this circuit applies Ninth Circuit law, that Taniguchi, a Ninth Circuit case, was controlling. And as a policy question, does this court want to encourage every potential issue that is a potential that, in the words of the Morris case, some courageous litigant in another case happened to see? That's exactly the line of analysis that the Supreme Court follows in the two cases I'm talking about. And what they said was, no, in cases in which there's a wall of contrary authority against you, an impermeable barrier. But if, for example, there's a split in the circuits, or there's some reason to think that the Supreme Court might change the law of the circuit, then the rule may be different. And that seems to me to be your situation when you were faced with the question of whether to raise the Taniguchi issue. Well, I, well. You had a conflict in the circuits. The Seventh Circuit had gone the other way. This court, as I understand it, does not, if there is, because it follows controlling law, this court is not going to reverse Ninth Circuit law. No. This circuit will follow Ninth Circuit law. And almost certainly would not have ruled in your favor at that juncture. But A, you could have petitioned for certiorari. B, you could have, if you got a remand, as you did, having preserved it the first time around, you would be entitled to raise it again. But you didn't. That's the problem. Well, we did raise it on remand after we thought that there was a basis, having seen the questions at the Supreme Court. Prior to that time, we believed there would have followed Ninth Circuit law. Wait a second. If I understand correctly, the Ninth Circuit decision in Taniguchi came up after the cost issue was raised in the first place, right? That's correct. And so even before Taniguchi, when there was no Ninth Circuit authority on this, you didn't raise this issue, right? I'm sorry. No. Taniguchi had been decided by the Ninth Circuit during the, and it was applied. We followed it in the first cost issue. But when you made your first objection to the cost, and maybe I'm wrong about this, but when you made your first objection to the cost, my understanding is that Taniguchi had not yet been decided. Is that correct? I don't remember the timing. I believe that there was other Ninth Circuit authority as well as District Court authority that held that those written interpreter costs were properly taxable under the then applicable rules. Now there is no dispute that there is no statutory authority for those costs to be applied. And we would submit that under Morris, when there is a clear change of intervening law, that that should be applied in this case. If there are no further questions. Is it $80,000? It's $80,900. Just under $81,000. That's correct. Thank you, Mr. Brothers. Thank you. Case is on revise.